

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

SEP 3 0 2005

CLERK, U.S. DISTRICT COURT
By _____
    Deputy

| | | |
|---|---|---|
| PAUL J. BROWN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 5:04-CV-0245-C |
| | § | |
| JO ANNE B. BARNHART, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Plaintiff Paul J. Brown seeks judicial review of a decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits (DIB). The United States District Judge, pursuant to 28 U.S.C. § 636(b), referred this case to the United States Magistrate Judge for report and recommendation, proposed findings of fact and conclusions of law, and a proposed judgment. After reviewing the administrative record and the arguments of both parties, this court recommends that the District Court affirm the Commissioner's decision and dismiss Brown's complaint with prejudice.

## I.   Statement of the Case

Brown applied for DIB on April 15, 1999, alleging that he stopped working on September 26, 1997, and was disabled because of osteoarthritis, degenerative spine disease,

carpal tunnel syndrome, heart problems, and eye problems. (Tr. 46, 55.)[1] An Administrative

Law Judge (ALJ) held a hearing and issued a decision on October 20, 2000, in which he

found that Brown was not disabled. (Tr. 211-40.)

On December 18, 2002, the Appeals Council denied Brown's request for review.

(Tr. 7-8.) For reasons not clear from the Transcript, almost two years later on September 13,

2004, the Appeals Council extended the time in which Brown was permitted to file a civil

action in a United States district court to 35 days after September 13, 2004. (Tr. 6-7.) Brown

filed his complaint with the District Court on October 18, 2004.

## II.   Judicial Review

The court's review of Social Security appeals is limited to determining two issues:

(1) whether the Commissioner's final decision is supported by substantial evidence, and

(2) whether the Commissioner used proper legal standards to evaluate the evidence.

42 U.S.C. § 405(g) (2004); *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (citations

omitted).

## III.   Discussion

### *The ALJ's Credibility Analysis*

In his first point of error Brown contends that the ALJ failed to follow the correct

standards for evaluating pain. Specifically, he contends that the ALJ failed to consider his

---

[1]

The Commissioner submitted two volumes of records in this case. The first volume, filed on March 11, 2005, contains records related to another application for DIB that Brown filed with the Social Security Administration. The second volume, filed on May 3, 2005, contains records related to the application at issue in this case. Therefore, all cites to the Transcript are to records contained in the second volume of records.

work record and the type, dosage, effectiveness, and side effects of medications he took to alleviate his pain and other symptoms and that he distorted the evidence.

As Brown contends, the ALJ was required to consider his medications and his work record. 20 C.F.R. § 404.1529(c)(3) (2005). However, the ALJ complied with this requirement.

At the hearing Brown's representative informed the ALJ that Brown worked for a natural gas company for approximately 20 years, (Tr. 213), and the ALJ acknowledged Brown's work experience, (Tr. 20, 216). Although the ALJ did not discuss the length of Brown's employment with the natural gas company, there is no evidence that he did not consider the longevity of Brown's employment.

In regard to the ALJ's consideration of Brown's medications, Brown points out that he testified that he took Lodine twice a day and Tylenol at bedtime. Although the ALJ did not specifically refer to these medications, he noted that Brown's arthritis was responsive to medication. (Tr. 15; *see* Tr. 79, 87, 228.) He also noted that fatigue was a side effect caused by Brown's cardiac medication which was addressed with a reduction in the medication. (Tr. 16.)

In regard to his contention that the ALJ distorted evidence, Brown argues that the ALJ distorted his testimony regarding his daily activities. He faults the ALJ for stating that he lived on two acres and was able to perform his yard work utilizing a riding lawn mower. (Tr. 17-18.) However, Brown testified that he did "a little bit of yard work" and that he cut

3

between one-half acre to three-quarters of an acre in 30 to 40 minute increments with rest breaks between work periods.  (Tr. 221.)

Brown also faults the ALJ for statements he made regarding his work on classic cars. Brown testified that at one time he restored and worked on cars, that he did not do much of that sort of thing anymore, but that he kept two classic cars on his property.  (Tr. 219.) He testified that he cleaned the cars, made minor adjustments to the cars, and replaced parts on the cars.  He told the ALJ that he recently replaced the mirrors on one of the cars and cleaned the chrome.  (Tr. 219-20.)  He testified that when he worked on the cars he worked 30 to 45 minutes at a time performing such tasks as cleaning the chrome on the engine, cleaning the trunk, polishing the chrome on the wheels, checking the oil and transmission, and starting up the cars and driving them.  (Tr. 224.)

Brown testified that although he once took the cars to car shows, he no longer did that because it "[took] too much work" but that once per month during the summer he and his wife took one of the cars to show at a place in town where people with classic cars gathered. (Tr. 220.)

The ALJ acknowledged Brown's testimony that he was able to "drive and to transport his classic cars to shows in town on about a once-a-month basis."  (Tr. 18.)  He also noted that in assessing Brown's credibility, he considered his allegations of debilitating hand and shoulder symptoms and found them inconsistent with his ability to perform car maintenance and/or repair activities such as cleaning the chrome and polishing the wheels on his classic cars.  (*Id.*)

4

Brown contends that the ALJ erred in omitting from his decision the fact that Brown no longer showed his cars in car shows. He also points out that he spent only 30 to 45 minutes doing the maintenance activities on his car.

The ALJ did not err. The ALJ considered that Brown drove his classic cars to a monthly gathering in conjunction with considering the other activities Brown engaged in on a regular basis. (Tr. 17-18.) Those activities included frequenting a local coffee shop in the mornings about three times per week; visiting a friend's shop during some afternoons; helping with household chores; performing yard work; working on his classic cars; shopping; and watching television. (*Id.*; *compare* Tr. 220-22.) The fact that the ALJ did not mention that Brown no longer showed his cars at car shows was not error. The ALJ cited Brown's testimony regarding his activities for the purpose of illustrating that the level of activity Brown engaged in reflected a lifestyle inconsistent with disability as that term is defined in the regulations. The fact that Brown no longer showed his cars at car shows was irrelevant to the ALJ's point. Brown may not have been as active as he once was; however, that would not change the fact that he continued to engage in other activities on a regular basis which were inconsistent with disability. Further, the fact that Brown did not testify as to how much time he spent on other activities such as housework or visiting friends was irrelevant. Again, the ALJ's purpose in citing Brown's testimony regarding his daily activities was to stress that the sum of those activities were inconsistent with disability.

In addition, the ALJ did not err in omitting from his decision the fact that Brown worked on his cars for only 30 to 40 minutes at a time. The ALJ's purpose of noting that

5

Brown worked on his classic cars was to illustrate that the activity of cleaning chrome and polishing wheels was inconsistent with allegations of debilitating hand and shoulder symptoms. (Tr. 18.)  This conclusion is reasonable.  It is reasonable to conclude that an individual with debilitating hand and shoulder problems would be incapable of cleaning chrome and polishing the wheels on a car regardless of the amount of time the individual spent doing the activities.

Brown further faults the ALJ for finding that his allegations of debilitating knee, hand, and shoulder symptoms were inconsistent with his testimony that he chose to drive a five-speed 1993 Dodge diesel truck for daily driving, on out of town trips, and to car shows because driving such a vehicle would place additional stress on his knees, hips, and lower back, as well as his hands and shoulders. (*See* Tr. 18.)  Brown contends that he drove his truck for limited activities and that he testified that his wife drove when they visited his grandchildren out of town and that there is no evidence as to what vehicle was driven on out of town trips.

Brown did testify that his wife drove on out of town trips. (Tr. 223.)  However, this fact does not diminish the ALJ's conclusion that choosing to drive a five-speed diesel truck is inconsistent with disabling orthopedic symptoms.

### *The ALJ's consideration of treating source opinion*

Brown contends that the ALJ failed to accord proper weight to opinions provided by his treating cardiologist, Howard P. Hurd, II, M.D., F.A.C.C., F.A.C.P. (Tr. 148-51.) Dr. Hurd provided his opinions on a physical capacities evaluation form.  Among Dr. Hurd's

6

opinions was that Brown was capable of sitting for a continuous period of six hours during an eight-hour work day and was capable of standing and/or walking for a continuous period of one hour in an eight-hour work day. (Tr. 148.)  He believed that Brown's fatigue had a marked effect on his ability to function and that his pain had a moderate effect on his ability to function. (Tr. 150.)  He noted that Brown's symptoms included fatigue, palpitations, dizziness, and left neck pain and that Brown had considerable arthritic pain in his left knee and in his back, which was predominantly disabling. *Id.*  He also indicated that Brown's symptoms would often interfere with attention and concentration; that he could not use his hands for repetitive pushing and pulling or activities requiring fine manipulation; that he could not engage in activities involving unprotected heights; and that he was moderately limited in regard to working around moving machinery and driving automotive equipment. (Tr. 148-51.)

Brown contends that the ALJ did not state and make clear what weight, if any, he gave to Dr. Hurd's opinions and the reasons for that weight; that the ALJ substituted his opinion for that of Dr. Hurd; that the ALJ failed to accord great weight to Dr. Hurd's opinions when there existed no good cause for his failure to do so; and that he failed to request additional information from Dr. Hurd.

Brown's contentions are incorrect.   The ALJ's residual functional capacity determination accommodated many of the limitations Dr. Hurd cited on the physical capacities evaluation form. The ALJ found that Brown was limited to jobs in the light work

7

category that would allow him to sit or stand at his option; that would not require driving or working around heights or moving machinery; that would not require climbing, crawling, kneeling or repeated pushing/pulling; that would not require repeated extended reaching or repeated use of the hands; that required only occasional stooping, crouching, and squatting; and that could be performed with a less than a moderate concentration deficit.  (Tr. 19.) On the other hand, the ALJ indicated that he rejected Dr. Hurd's opinions to the extent that they were inconsistent with the physician's own records and other evidence in the record. (Tr. 16.)

Dr. Hurd's opinions regarding Brown's orthopedic limitations were, in fact, inconsistent with the remaining record.  (Tr. 123, 167, 177, 181.)  Likewise, as the ALJ noted, Dr. Hurd's opinion of marked limitation due to fatigue as well as his indication that Brown suffered from symptoms such as dizziness, palpitation, dyspnea, and anginal discomfort during ordinary physical activity were inconsistent with Dr. Hurd's own treatment records.  (Tr. 19.)

Dr. Hurd's examination notes reveal only occasional palpitations, no dyspnea, no orthopnea, and very occasional lightheadedness (four times per year). (Tr. 152, 155, 159-60.) Although Brown complained of fatigue caused by a prescription medication, Dr. Hurd reduced the dosage, which successfully addressed the problem.[2]  (Tr. 152.)

---

2

In addition, Dr. Hurd reported that physical examinations were normal, an exercise electrocardiogram was normal, and a thallium scan was mildly abnormal. (Tr. 155, 159.)  Dr. Hurd's impression was increased risk of ischemic heart disease and he noted on October 20, 1999, approximately two weeks before he completed the physical capacities evaluation form, that he would "not recommend further assessment at [that] time" and that Brown should return to his clinic in one year.  (Tr. 152.)

8

A treating source opinion regarding the nature and severity of a claimant's impairments must be given controlling weight if it is "well supported by diagnostic techniques and is not inconsistent with other evidence." *Newton*, 209 F.3d at 455 (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)). In this case, Dr. Hurd's opinion was inconsistent with other evidence. In such a case, good cause permits the ALJ to reject a treating source opinion. *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995). The ALJ was therefore free to reject the portions of Dr. Hurd's report that were inconsistent with the other evidence. In addition, the ALJ complied with the dictates of *Newton* and 20 C.F.R. § 404.1527(d). He acknowledged that Dr. Hurd was Brown's treating cardiologist; he acknowledged the length of the treating relationship and the frequency of Dr. Hurd's examinations; and he considered and analyzed whether there was support in the record for Dr. Hurd's opinions and whether the opinions were consistent with the record as a whole. (Tr. 15-16.)

Finally, the ALJ was not required to recontact Dr. Hurd to determine whether additional evidence was available. The regulations provide that the ALJ should contact a treating physician for additional information or for clarification of his opinions when: the physician's report contains a conflict or ambiguity that must be resolved; the report does not contain all the necessary information; or the report does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1512(e)(1). In addition, the ALJ should recontact a treating physician to resolve any doubts or gaps in the record. *Newton,* 209 F.3d at 457-58. None of these situations were present in this case.

9

*The ALJ's finding regarding Brown's blepharospasm*

Brown has blepharospasm, which is a condition that causes involuntary spasmodic contractions in the muscles of the eye area. STEDMAN'S MEDICAL DICTIONARY 213 (27th ed. 2000). He contends that the evidence concerning his blepharospasm demonstrates that the condition precludes him from working. He points to a form Douglas Kopp, M.D., an eye specialist, completed in 1996 at the request of an insurance carrier. Dr. Kopp noted that Brown's blepharospasm caused a "significant and unpredictable amount of time in which he [was] essentially blind due to eyelid closure" and that driving and working with machines and at heights would be potentially dangerous to him. (Tr. 105.) He further indicated that Brown might be able to work at a desk job if "accommodations could be made." *Id*.

First, it should be noted that the ALJ relied upon Dr. Kopp's opinion in part by finding that Brown could not work in jobs that required him to drive or to work around heights or moving machinery. (Tr. 19.)   Second, neither Dr. Kopp's letter nor any of the other evidence demonstrates that Brown's blepharospasm precluded him from working.

Brown's blepharospasm caused "intermittent moderately severe spasms" for which he underwent a myectomy in spring 2000 with "satisfactory result." (Tr. 187, 193, 195.) Although there was some residual blepharospasm, the spasms were treated effectively with Botox injections. (Tr. 210.)

Brown testified that the injections worked well to abate the spasms most of the time. (Tr. 218.) On the other hand, he also testified that he experienced "quick blinking" in which his eyes closed for 30 seconds to one minute. Yet despite these symptoms, he was able to

10

see well enough to drive; he testified that he drove to a coffee shop three times per week. (Tr. 222.)

Given that Brown's blepharospasm did not prevent him from driving a vehicle, and given the opinions from his physicians regarding the satisfactory results of the myectomy and the Botox treatments, Brown's blepharospasm was not disabling.

### *Additional Evidence*

Brown seeks remand for the purpose of providing the Commissioner with additional evidence. A district court may "order additional evidence to be taken before the Commissioner of Social Security." 42 U.S.C. § 405(g) (2004). However, remand for this purpose is not justified unless the evidence is (1) new, (2) material, and (3) the plaintiff shows good cause for failing to incorporate the evidence into the record in a prior proceeding. *Id.*; *Leggett v. Chater*, 67 F.3d 558, 567 (5th Cir. 1995); *Bradley v. Bowen*, 809 F.2d 1054, 1057-58 (5th Cir. 1987).

The evidence Brown submits consists of two letters written by Dr. Kopp concerning Brown's blepharospam, a report by a consulting physician, and a functional capacity evaluation completed by a physical therapist.

The evidence meets the first requirement that it be new because it was generated after the ALJ's decision. *See Latham v. Shalala,* 36 F.3d 482, 483 (5th Cir. 1994) (evidence created after the Commissioner's determination is new evidence).

On the other hand, the evidence does not meet the second requirement because it is not material. In order to meet the "materiality" requirement, new evidence must be relevant

11

and probative. *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981) (citation omitted). Some evidence is of limited value and insufficient to justify the administrative costs and delay of a new hearing; thus, remand is not justified if there is no reasonable possibility that the new evidence would have changed the outcome of the Commissioner's determination. *Id.*; *see also Bradley*, 809 F.2d at 1058.

The evidence Brown submits is cumulative and would not have changed the outcome of the Commissioner's decision. The evidence from Dr. Kopp consists of letters written on Brown's behalf to the Texas Rehabilitation Commission and to his employer's insurance carrier. (Pl.'s Compl. Ex. B. 25, 36.) Dr. Kopp stated in the letters that Brown's vision was extremely poor at times when he was unable to open his eyes; that he had difficulty with frequent blinking which affected his ability to see; and that, intermittently, he had difficulty with the ability to keep his eyes open which caused him not to see. He indicated that Brown's blepharospasm would be an ongoing problem that would require regular and ongoing treatments. The record before the Commissioner contained evidence from Dr. Kopp which includes the same opinions as those expressed in the letters Brown now submits; therefore, the evidence is cumulative. (*See* Tr. 105.) Further, although Dr. Kopp's letters were written after Brown underwent the myopathy, the evidence in the record, including Brown's testimony regarding the effectiveness of Botox injections and his daily activities, demonstrates that Brown's residual problems with blepharospasm were not disabling. For these reasons, there is not a reasonable probability that the evidence would have changed the Commissioner's decision.

12

Brown also submits a record of a consultative examination by Charles Reynolds, M.D.
Among Dr. Reynolds findings was that Brown could carry 25 pounds and lift 30 pounds,
could sit one hour and stand 15 minutes, that he had a slow gait, and that he had diminished
capabilities in his hands although he could button his clothes and pick up pencils and could
handle objects. (Pl.'s Compl. Ex. B. 18-21.) Dr. Reynold's examination notes do not conflict
with any of the ALJ's findings in regard to Brown's residual functional capacity. (*Compare*
Tr. 19 and Pl.'s Compl. Ex. B. 18-21.)  Therefore, there is no reasonable possibility that the
evidence would have changed the outcome of the Commissioner's determination.

The last piece of evidence was provided by a physical therapist and is dated
October 14, 2003. (Pl.'s Compl. Ex. B. 66.) The physical therapist indicated that Brown was
capable of light work but that he would not be able to tolerate working on a day to day basis
and that if he were to return to work, he would require numerous breaks as well as the
freedom to work at his own pace and change positions on an as needed basis. (*Id.*)  There
is not a reasonable probability that the physical therapist's opinion would have changed the
Commissioner's decision.

The physical therapist's opinion that Brown could perform light work and would need
to change positions on an as needed basis actually supports the ALJ's finding that Brown
could perform light work with limitations and a sit/stand option. (*See* Tr. 19.)  Further, the
opinions regarding Brown's inability to sustain work would not be entitled to controlling
weight because they were not rendered by a "treating source," 20 C.F.R. §§ 404.1502,

13

404.1513, and because they are legal conclusions rather than medical opinions, 20 C.F.R. § 404.1527(e).

Finally, remand should not issue because Brown has not met the third requirement of showing good cause for remand. In order to show good cause, a plaintiff must offer a proper explanation as to why evidence was not submitted earlier. *Pierre v. Sullivan*, 884 F.2d 799, 803 (5th Cir. 1989) (citation omitted). Good cause is not established merely because the evidence was generated after the Commissioner's decision. *Id*. at 803-04. Brown has provided no explanation as to why the evidence he now submits was not provided to the Commissioner at an earlier time. Based on this failure alone, Brown's request for remand for the consideration of new evidence must be denied. *Id*.

**IV.    Recommendation**

Based on the foregoing discussion of the issues, evidence and the law, this court recommends that the United States District Court affirm the Commissioner's decision and dismiss Brown's complaint with prejudice.

**V.    Right to Object**

Pursuant to 28 U.S.C. § 636(b)(1), any party has the right to serve and file written objections to the Report and Recommendation within 10 days after being served with a copy of this document. The filing of objections is necessary to obtain de novo review by the United States District Court. A party's failure to file written objections within 10 days shall bar such a party, except upon grounds of plain error, from attacking on appeal the factual

14

findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

Dated: _____September 30_____, 2005.

NANCY M. KOENIG
United States Magistrate Judge

15